Plaintiff in error, G.B. Allison, was tried in the district court of Comanche county on a charge of assault upon the person of J.H. Stuart, with a deadly and dangerous weapon, with intent to kill, and was convicted of assault with intent to do bodily harm. He was sentenced to serve one year in the county jail.
The prosecuting witness testified as follows:
"I now reside at Newkirk, Okla.; have resided there ever since the 1st of February. Prior to that time, resided in Comanche county, up near Sterling. Am a married man. My occupation in Comanche county was a farmer. I think I resided there a little over three years. Owned my own farm; still own it. Know defendant. My house was a half a mile northeast of Mr. Allison's house. Lived about four and one-half or fice miles southeast of Sterling. Known Mr. Allison almost four years. Lived up in that neighborhood until last February. Saw Mr. Allison on November 30th of last year a mile and a half, probably two miles, southeast of Sterling. It was about noon. I was traveling in any open buggy, a road wagon, driving a single horse, *Page 179 
going east. Met Mr. Allison there about a mile and a half east of Sterling, and probably a half mile south of the corner of Sterling. He was going west. There was a young man with him. Mr. Allison was in a buggy, a double rig, and had a top on it. The first I knew it was him I was meeting was when he called my name; stopped and called my name, `Mr. Stuart.' I was rather looking down to avoid getting into a ditch on this side of the road, and when he said, `Mr. Stuart,' I looked up and says, `Hello.' He made the remark, `I offered to pay you for them hogs'; and I says at that time, I says: `Why didn't you come across and do it? You never even claimed them.' He said, made the remark, `I sent my little boy, Sam,' and says: `I told Sam what I intended; that I intended to do what I said in the note I sent him.' And I started to say, `It was Sunday,' and he said: `Sunday! You scoundrel! I saw you drive them off of the other man's land.' I said: `You lie. I never done it.' And at that he grabbed the shotgun and jumped out of the buggy, and at that I leaned forward and struck the horse with the lines, and spoke to the horse to get up, and was going up the road in a gallop when I was shot. When I drove off I didn't look back to see what he done; didn't look back until after I was shot. He shot with a double-barrel shotgun. When he shot, I dropped in the seat and peeped around the north edge of the seat. I saw Mr. Allison standing at the north side of his buggy. I couldn't distinguish whether he had anything in his hands while he was standing there. Saw him grab the gun before I whipped the horse with the lines. Did not have a whip in my buggy; I struck with the end of the lines. One shot struck me in the left shoulder blade. After I was shot, I drove on to Mr. Stice's residence; that is on my way home. It would be a little over 80 rods from where I was when the shot struck me. When I got there I hitched my horse and went into the house. I went up to the door and knocked, and Mr. Stice came to the door, and I went in; didn't look back to see what became of Mr. Allison after I was shot. Only remained at Stice's a short time. I then proceeded on home. Phoned Dr. Cannon from Mr. Stice's; he came to our place immediately. When Mr. Allison mentioned that he had offered to pay for the hogs, I asked him why he didn't do it. I says: `You never even came across and claimed them.' I have reference to a bunch of hogs I had taken up Sunday prior to this on my premises. I turned the hogs out and sent them home after I was shot. The hogs had been depredating on my premises there at the time I shut them up. Didn't know for certain whose they were; thought *Page 180 
they were Allison's. I wrote a note and told him. I think I described the number of hogs. Told him I had them, and if they were his to come over and pay for the trouble and take them; and if they wasn't his I would have to proceed to advertise as stray stock, and treat them as stray stock I don't remember how I said it. In reply to that, I received this note. [Marked `Exhibit A.'] Can't see well without glasses, not so good as the average man. When Mr. Allison first drove up, did not recognize him until he spoke; then I recognized him. His rig was stopped as I looked up; his rig was standing still. Saw the rig approach down the slope. I knew I was meeting the rig, but couldn't distinguish who it was. That occurred in state of Oklahoma, county of Comanche. I did not drive the hogs on my place. We had not been good neighbors."
Dr. Cannon, on behalf of the state, testified:
"I am a physician and reside at Sterling. Am acquainted with J.H. Stuart. Was called to see him on or about the 30th day of November, 1908. Saw him at his home. It was about noon. Made an examination of his body for wounds; found a shot wound in the left shoulder. The shot was just about where you have a suspender in the back of the shoulder. I extracted the shot; it was imbedded against the bone, the shoulder blade. Know the size of shot used in shotguns. The shot was about No. 6 or 8; have that shot with me." (Witness produced the shot; offered in evidence.)
J.E. Sims, on behalf of the state, testified:
"I live in Comanche county, Brown township. Know defendant; know J.H. Stuart. I was constable in Comanche county about the 10th of November, 1908. Lived something like a quarter of a mile from Allison. Lived three-quarters of a mile from Stuart. The time when it is alleged that Allison shot Stuart was about eleven o'clock. I recollect the time. Saw defendant the day before the shooting. Saw him on Sunday; he was at my place. Had a conversation with defendant in regard to Stuart. He came to my house on that Sunday morning. It must have been nine or ten o'clock. He came up and asked if I had a law book, and I told him, `No.' I says, `Why?' He says: `Stuart got my shoats again, and I came up to see if you had a book with the law governing stock.' And I says: `No; I haven't got any on the place.' He says: `He taken them up a while ago, run them in, and sent me a note by the boy. He taken them up a while ago, and sent me a note by his son, and said he had the hogs up, and come down and pay the damage, and he *Page 181 
would turn them loose.' And I believe, I think further, he says: `He didn't bring it himself.' He says, `No.' He says: `God bless you, I will give any man a $10 bill to get him on the corner of my place.' On Monday after the trial ended, there was some four or five down here and went on the stand and testified against him, and he said they swore a lie and tried to blackmail him; and he said he was going to get even with them. And he said the best citizens of Lawton told him he ought to take his gun and shoot them down wherever he met them; and he kept talking. I couldn't say what all he said. I remarked to him, I says: `You beat the case, and what else do you want?' I says, `I would keep still, if I was you.' Mr. Stuart was one of those people who testified against him at that trial. Saw Mr. Allison off and on from the time of the trial and the conversation I have related until the time of the shooting. During that time, he went armed generally, with a shotgun, breechloader, No. 12, double barrel. When I heard about the shooting, I went to Allison's house. He seemed to be somewhat excited. He says, `I suppose you heard what I done.' I says. `Yes.' He says: `I will turn myself over to you, and whatever you say,' he says, `I will do.' I says, `I guess the best thing I can do is to go to Lawton.' And he says, `Well, all right,' and he turned to Emmett and says, `Go tell your mother.' There was a gun in the buggy; it was a double-barrel gun. They taken the gun in the house."
The accused, in his own behalf, testified:
"I am 53 years old. Lived in Brown township, Comanche county, on November 30, 1908. At this time, am living in Lawton; have lived here since last Wednesday week. Am the defendant. Acquainted with Mr. Stuart. Saw Mr. Stuart on November 30, 1908. Saw him between my place and Sterling. I was going from my house to Sterling. I lived five miles and a half southeast of Sterling, and my nephew and myself was in the buggy, and we met Mr. Stuart. My nephew's name is Marvin Allison. Mr. Stuart was coming east in this direction, and I was going west. He passed me on the right of me, and myself on the right of him, and Mr. Stuart stopped just, not exactly to my left, but a little in front of me like, and his buggy dropped down in that rut, one wheel of it; but I don't remember whether I spoke to him or him — He says, `Hello,' and I says: `Mr. Stuart, 30 minutes after you run my hogs in yesterday, I wrote you a note that I would pay you if they damaged you.' And when I said that he just raised his hands. Now, I hate to repeat the words, gentlemen; a man that has any respect for womanhood *Page 182 
would not use them. He says, `You are a God damn lying son of a bitch, and I will kill you,' and when he said that I jumped out of the buggy. I thought the gun was coming right on me. And when I did — my mules was young, and they jumped — and when my mules jumped, that left me right exactly opposite Stuart, and he had his gun right ready to draw, ready trying to get it on me, and I dodged right behind his buggy; and when I did, my foot slipped into that ditch as I pulled the trigger, and I suppose that's the reason he only got one shot, gentlemen, in place of the whole load. I was in the buggy when he first made the pass for his hip pocket. The reason I got out of the buggy was because I just thought he was going to kill me. He told me he was going to kill me. He said he would. I supposed from the way he moved his hands he had a gun. He had a gun. My mules jumped and left me opposite Stuart, and I jumped in behind him, and him turning this way. He was going east, just in this direction, and I was right there, and he was turning his gun on me, and I went in behind his buggy back there, and went into that rut. I fired that shot because I thought my life was at stake. Didn't fire the other shot, because he throwed the gun down and run. The other barrel was loaded with bird shot. No difference in the barrels. The right-hand barrel was one of these plover barrels that scatters, and the left-hand was a choked barrel. I used the right-hand barrel, the one that scatters. Dropped his gun right down in the buggy in front of him; begun to whip with both hands. I seen he had his lines and begun to. Marvin was holding the mules. He did not get out. That is the customary road for me to go from my house to Sterling. Had been in the habit of driving over that road often. The road was dry. For some time prior, the weather had been dry. I know the roads was very dry. Did not fire any shot after he was ten yards from me. Did not fire any when he reached approximately sixty yards from me. After I fired the shot, he grunted. He did not get down in the buggy seat, nor peep around the corner of the buggy seat. The reason I had the gun along was because it was bird time, quail. I shoot quail sometimes. That is why I had the gun along. Had been doing some shooting that day. During the quail season, it is my habit to carry a shotgun with me. The shells were suitable for shooting quails. At the time Stuart called me a God damn son of a bitch, he seemed to be awful angry. It had been some time since he had spoken to me. Grandpa Sims had told me to be careful; he would hurt me. He said he was informed he was prepared for me. Jim *Page 183 
Sims also warned me. He told me Stuart was a bad man; if he had an opportunity he would hurt me. At the time Jim Sims made the statement, Marvin Allison was present. At the time Grandpa Sims was present, Jim Sims said about the same thing. Never told Jim Sims that some of the good people down here at Lawton told me I ought to get my gun and kill all the neighbors around there that testified against me. I said if I done my Christian duty — Stuart and all those trying to connect me with the very privates of my eleven year old girl — I said if I had done my Christian duty, I would have taken the gun and killed these villians; that's what I said. They tried to connect me, and his honor knows it; and I want you to understand it. I will tell you, John Fain, if they was to do you that way, you would take a gun to them, and any other sensible man; and if these jurors wouldn't do it they are not fit to be jurors. No; I will tell you they wouldn't be fit to be jurors if they didn't do it. None of them would be men, when they tried to connect me with the private parts of my eleven year old girl, if they wouldn't take a gun to such men. You swore right there you was going to prove things by me, and you didn't prove it; you prejured yourself, and that girl perjured herself, and you yourself perjured yourself; and you impeached yourself as an officer by not doing it, and you are an impeached officer and a perjurer. From that time I have spoken to Mr. Stuart; but he has not spoken to me."
J.A. Sims, on behalf of the accused testified:
"I live five miles southeast of Sterling. Lived there five years, about three-quarters of a mile, or hardly that far, from Mr. Allison's residence; a little over three-quarters from Stuart's place. Besides farming, I have been working for a purchase house in Chicago four years. In October or November of last year, I was engaged in canvassing for my books; had been over the different roads. It is my impression the roads were dry in November, 1908. I told Mr. Allison, I said: `I want to put you on your guard, and you be particular.' He says, `Why so?' I says: `Just as sure as you go to tackling three different men, giving their names, that when you do, they will be ready for you.' That was before the shooting. Mr. Stuart was one of the men I had reference to. Mr. Seymour and Bob Williams were the others."
John Hickey, on behalf of the accused, testified:
"I live up close to Sterling, six miles between Marlow and Sterling, six and one-half from Sterling southeast. Acquainted with Mr. Allison. About November 30, 1908, I was hauling hay and corn from above where Mr. Allison lived up by *Page 184 
Mr. Zackery's up about eight miles out to where I live. Went over the roads east of Sterling. Seems to me like the road was dry. I don't remember of any water, or anything of the kind. And probably some hazy weather, something like this, when I was hauling. I don't remember having to drive across any mud and water."
J.P. Ratliff, on behalf of the accused, testified:
"I live two miles from Sterling. Live on the farm and keep post office at Sterling. Lived there eight years. Was in and around that vicinity of Sterling on or about November 30, 1908. I came from Elgin on the 30th. The roads wasn't muddy between there and Elgin. Everybody was gathering corn. The roads was good."
Emmett Allison, for the accused, testified:
"I put the gun in the buggy. My father did not direct me to. G.B. Allison is my father. Did it on my own motion."
Marvin Allison, for the accused, testified:
"I am nineteen years of age. Live in Covington, Ga. Been here since Thursday a week ago. Acquainted with Mr. Allison; he is my uncle. Was out here the 28th of last March a year ago. Was farming after I came with Mr. Allison. Came out here for my health more for that than anything else. Lived with my uncle out near Sterling. Know J.H. Stuart. Saw J.H. Stuart on or about November 30, 1908, about two miles southeast of Sterling; also saw my uncle there. Went over there in a buggy, driving two mules. Mr. Stuart was going east. I was going west towards Sterling. Met him in the road. My uncle said: `Mr. Stuart, in thirty minutes after you drove my hogs in, I sent a note by my little boy, and offered to pay you for it.' And when he said that Mr. Stuart said: `You God damn lying son of a bitch, I will kill you.' He moved his arm that way. Seemed as he was going for his hind pocket. At the time he said that, my uncle jumped out of the side of the buggy. I held the mules. The mules jumped as he jumped out of the buggy. I had been driving. As he jumped out, he took a shotgun. He shot at Mr. Stuart; did not see him when he shot. I looked back as quick as I could stop the mules. The mules were young, and they were afraid when the gun fired. I looked as quick as I could. They hadn't gone very far when I stopped them, about ten feet, I reckon, When I looked back, my uncle was behind my buggy. Stuart's buggy was going up the road at that time. Couldn't say how far it had gone, about 30 or 40 feet, 50 feet, something like that. His horse was *Page 185 
loping. After my uncle fired I heard Stuart groaning as if a man was hurt. Did not hear him say anything. Stuart was sitting up in his buggy. Did not see him at any time in any other attitude after he started down the road, except a sitting posture. Did not see him behind the seat, out of sight. After my uncle got out of the buggy, he shot almost immediately — just as quick as he could step behind the buggy, step across. Heard Mr. Sims tell my uncle he better watch Mr. Stuart; that was prior to the time of the shooting. Had been living there with my uncle six or seven months. It had been my custom to go up to Sterling pretty often; the road was dry."
Cross-examination:
"Had been over to Mr. Stuart's house that morning before I started to Sterling. Emmett and I had been over there an hour or so before we started, I suppose. I know Mr. Stuart had gone to Sterling; think I did. Came and reported that fact to my uncle. Then he and I got in the buggy and started to town. I had gone over to Mr. Stuart's that morning in the buggy. I took the gun over to Mr. Stuart's. We had it laying under the seat of the buggy; been hunting birds that morning. Mr. Allison went to town after the mail. I did the driving. He carried the gun on to Sterling."
J.H. Stuart, in rebuttal for the state, testified:
"On November 30th of last year, when the assault was made upon me, I did not have a pistol on that occasion. Did not have a pistol that day. Did not have a pistol or gun of any kind about my person or buggy that day. Did not own a pistol; had not borrowed a pistol. Did not draw, or attempt to draw, a pistol at any time. Did not throw my hand to my hip pocket before Mr. Allison jumped out of the buggy, nor at any time. Did not throw my hand to the back part of my body at any time after I met Mr. Allison in the road. I had hold of the lines. Did not raise my hand and shake it in Mr. Allison's face and say to him: `You are a God damn son of a bitch, I will kill you.' I use no profane language. Did not call him any name or language, except that of a liar. When I called him a liar, I did not throw my hand to my hip pocket, or any place about my person. As soon as I seen the gun coming up, I started the horse up and drove off; drove to Mr. Stice's house. Mr. and Mrs. Stice, Wilson Brooks, and a young man they called Tom Key were there. Did not attempt to move the horse until I started to drive off. Did not attempt to move the horse until I struck him with the lines. Never owned *Page 186 
a pistol in my life. Never lived in the mountains, the Rocky Mountains or the Wichita Mountains. Came from Iowa to Kay county, and from Kay county here. Never, at any time prior to this time, made any threats of violence against Mr. Allison."
A.G. Lovett, in rebuttal for the state, testified:
"Know defendant; know Stuart. Live in the same neighborhood. Was one of the neighbors who testified against Mr. Allison in the case tried last March in the district court. Think Allison made a statement, or something like this, to me that he had no neighbors; but they were all damnable sons of bitches. Do not remember since that trial that defendant made any threat as to what he would do to the men that testified against him at that time. To the best of my knowledge, he said that he calculated to go onto all of us."
I.K. Bailey, in rebuttal for the state, testified:
"Am acquainted with G.B. Allison and Stuart. Live about a quarter of a mile, or a little over, from Mr. Stuart, about a half a mile from Mr. Allison. Know about the time when Mr. Stuart was shot. Went over to Stuart's on Sunday morning before the difficulty between him and Allison after a hog. Drove a hog home from Stuart's that morning; drove it right west of him across over the pasture. Was in my pasture driving the hog that morning. From where I was driving the hog in my pasture, could have been seen by persons sitting on Mr. Allison's gallery. I think so; I know I can see the house from about the place where I was. It was somewhat early; I should judge about 8 or 9 o'clock. After the shooting, I had a conversation with defendant about it. I was up on the south part of the place at work doing something, and got to talking about it. He told me that he got out of the buggy and shot at him, and talked like he shot to hurt him. He spoke about getting out of the buggy, and something about he stepped in a ditch or something, and his foot slipped and made the remark if his foot hadn't slipped he would have got him."
William Stice, for the state, testified:
"Know defendant and know Stuart. Live at Fletcher, Okla. Know the time of the difficulty between defendant and Mr. Stuart. I was living then out near Sterling, southeast, about a mile and a half across the fields, but the way they got to go around the roads, probably two miles and a half. The road from Mr. Stuart's to Sterling passed my house. I know the day of the shooting. About 12 o'clock that day, I was at home. Saw Mr. Stuart that *Page 187 
day. He reached my house about 12 o'clock. When I first seen Mr. Stuart, he was on my east porch, going to the door, and knocked. A young man by the name of Tom Key was working for me, and Wilson Brooks was there. That was just a very few minutes after the trouble, from what I know and learned. I helped Mr. Stuart. I taken off Mr. Stuart's coat. He had two coats on; he had one of those heavy duck coats on, and an outside black dress coat. He had that duck coat over the black dress coat; and he had the black dress coat buttoned with one button, and the duck coat he had it buttoned with one button. I made an examination of Mr. Stuart that day. First I helped him take his coats off. I felt through his pockets. I didn't put my hands into his pockets, but I pulled — I helped him get his coats back this way, and pulled off his coats off back; and as I pulled them back and laid them down I felt the objects in his coat, and went through his pockets and felt the weight of them, and he didn't have any gun about his coats. I afterwards examined his buggy. It was a one-horse buggy with a tolerable bed to it and no top on it. The back part of the buggy was tolerable high, high back. I examined the buggy to see if there was any weapons in it. Never found no pistol. He left the horse and buggy hitched to the post by the side of the front gate."
John Donald, for the state, testified:
"Live in Lawton. Work in a bank. Have had experience in shooting shotguns. Have had experience in shooting at game and at targets. Have had experience in the use of shotguns for the last seventeen or eighteen year; hunt a great deal. From my experience with a shotgun, would say a shotgun fired in the hands of one sitting, say, where I am now sitting, at a buggy, and the man sitting where this man is sitting on the jury, with a blue shirt, I believe all the shot would hit him. For a person to be shot with only one shot, they would have to be scattered. So that only one shot would hit on his shoulder blade, he would have to be about eighty yards."
Mrs. J.H. Stuart, for the state, testified:
"My name is Mandy Stuart. I am the wife of J.H. Stuart. Was living in this county on the 30th day of November last year. Remember the occasion of Mr. Stuart being shot on that day. Mr. Stuart never owned a pistol at that time; never did. Have not seen a pistol around my house and premises since I have been married to Mr. Stuart. To my knowledge, he did not have a pistol on November 30th. When he left there on the morning of November 30th, he had no gun whatever of any kind. Did not *Page 188 
have any pistol when he came home on that occasion. On the morning of the shooting, Emmett Allison and Marvin Allison came over to my house. I told them where Mr. Stuart had gone. I told them he had gone to Sterling; told them what business he had gone on. After that they went back home, direct home to Mr. Allison's home. That was between 10 and 11 o'clock. It was near onto 11, if I remember right. That is the only time they were there that day. Afterwards I seen a buggy leave with two men in it, going towards Sterling."
We have carefully gone over the assignments of error; and, while the instructions of the court are subject to some criticism, we find no error sufficiently prejudicial to the substantial rights of the plaintiff in error to justify a reversal of this cause.
The judgment of the trial court is therefore affirmed.